Edward H. THOMPSON and Rebecca Thompson Perry, Appellants,

v.

VINSON & ELKINS, Appellee.

No. 01–92–0996–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 5, 1993.

**618**

Will G. Dickey, Megan Gabel, Houston, Roy Q. Minton, John L. Foster, Austin, for appellants.

Phillip T. Bruns, Jean C. Frizzell, Houston, for appellee.

Before DUGGAN and DUNN, JJ., and SAM H. BASS, Assigned Justice.*

## OPINION

SAM H. BASS, Assigned Justice.

The appellants have filed a motion for rehearing. We overrule the motion for rehearing. However, we withdraw our previous opinion, substituting this one in its stead.

This is an appeal from a summary judgment granted to the appellee, Vinson & Elkins (V & E), in a case brought by the appellants, Edward H. Thompson and Rebecca Thompson Perry (the Thompsons), involving allegations of wrongdoing in the handling of trust property. In their sole point of error, the Thompsons contend that the trial court erred in granting V & E's motion for summary judgment. We affirm.

When reviewing a summary judgment, we begin with the proposition that the movant has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of

---

* The Honorable Sam H. Bass, former Justice, Court of Appeals, First District of Texas at Houston, sitting by assignment.

law. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548 (Tex.1985). In deciding whether there is a disputed material fact issue precluding summary judgment, we take evidence favorable to the nonmovant as true. *Id.* at 548–49. We indulge every reasonable inference in favor of the nonmovant. *Id.* at 549. We also resolve all doubts in its favor. *Id.*

The Thompsons' first amended petition names numerous defendants. **Its factual allegations pertinent to V & E are as follows.**

The Thompsons are residual beneficiaries under their aunt's will. Their aunt, Irma Beeley (Irma), provided in her will that the residue of her estate, after some specific bequests were made, was to be placed in a trust for the protection and well-being of her husband, Raymond Beeley (Raymond). The trustees were authorized to make payments to Raymond if, for any reason, he should be "in need."

In addition to being residual beneficiaries, the Thompsons had other potential benefits under the will. The trustees were authorized to pay them whatever amounts the trustees, in their discretion, deemed proper and sufficient for the Thompsons' education, health, support, and welfare. Raymond and a lawyer, Charles Johnson (Johnson), were named cotrustees under the will. Johnson, who is also an accountant, is a defendant, though not a party to this appeal.

Irma eventually began to deteriorate mentally. She executed a general power of attorney to Johnson and died not long thereafter. The most significant asset in her estate was her interest in the stock of Dixie Pipe Sales, Incorporated (Dixie), also a defendant and not a party to this appeal. Robert Beeley (Robert), another nephew of Irma and Raymond, and also a defendant not a party to this appeal, had an interest in Dixie. Robert sought to acquire more Dixie stock. Johnson was Robert's accountant and also the accountant for Dixie.

Raymond ultimately suffered a stroke. The stroke debilitated him mentally, and he eventually died. This left Johnson as the sole trustee of Irma's trust.

Johnson selected V & E to represent Irma's "estate and trust" in the process of distributing the trust's assets. V & E already represented Robert, a company owned by Robert, Dixie, and other members of the Beeley family, including Margaret Beeley (Margaret), who Raymond married after Irma's death, and who is also a defendant and not a party to this appeal. V & E did not check to see if there was any conflict in representing Irma's estate.

As it turned out, in representing the Beeleys, Thomas H. Wharton, a partner at V & E, had written a letter to Margaret and Raymond which addressed the issue of who would wind up with the Dixie stock that was to pass to the Thompsons under Irma's will. In relevant part, the letter states as follows:

> It is my understanding that a year or so ago, some thought was given to having the company redeem the Dixie stock that would be owned by the trust created under Irma's will for you. The main consideration for such a redemption would be to make certain that the Dixie stock did not fall into the hands of Irma's niece and nephew [the Thompsons] and would stay in the Beeley family. Bobby [Robert] tells me that he had discussed that with you and, at least at some point, you had thought you might want to go forward with such a redemption. Depending upon what your feelings are with respect to the future of Dixie, Charles [Johnson] is planning to suggest that you might wish to explore the possibility of having the company redeem not only the trust stock, but your stock. One advantage to redeeming all of the stock would be that neither you nor Charles could be criticized for the value placed upon the stock redeemed from the trust. Assuming all the stock was valued in the same manner. [sic] Although I have talked to Bobby about the possibility of redeeming the trust stock, I have not, nor has Charles, mentioned to him any thought of redeeming your one-half.

This plan, however, was "shelved," and a new plan concocted whereby Dixie would acquire the trust's stock at book value.

After Raymond's death, the Thompsons employed an attorney to work with Johnson in arranging the distribution of the trust assets. The Thompsons' attorney contacted Johnson and V & E. He was unable to work with them to the Thompsons' satisfaction, however, so the Thompsons sued Johnson for an accounting. Ultimately, V & E agreed to voluntarily provide the information the Thompsons sought.

**Continuing with the factual allegations in the Thompsons' first amended petition:** Johnson and V & E then implemented the new plan to manipulate the Thompsons into agreeing to take book value for their Dixie stock. They misrepresented to the Thompsons the value of the stock, concealed facts about restrictions in Dixie's bylaws on the sale of stock, and sent the Thompsons a letter for their signature which set out a proposed agreement that the Thompsons should be paid only book value for the stock. The plan, however, failed; "[t]he trick did not work." The Thompsons returned the letter unsigned.

C. Boone Schwartzel (Schwarzel), another V & E partner, submitted an accounting to the Thompsons. He also wrote a letter to the Thompsons' attorney, suggesting that if the Thompsons did not come to an agreement with Johnson and V & E on how much the Thompsons should be paid for the stock, the trust's assets would be consumed by attorney's fees. The letter stated in relevant part as follows:

> With respect to the amount of money to be retained, the amount of attorney's fees and accounting fees to be incurred in resolving the Dixie matter and any issues raised by your clients is uncertain, particularly in view of the actions taken to date by your clients ... Johnson is familiar with cases in which accounting fees and legal fees have been extremely high. In fact, in a matter to be concluded shortly, over $500,000.00 in attorney's fees were incurred by co-trustees relating to the administration of trusts over less than a two-year period. Thus, until the nature and extent of your clients' claims can be ascertained, our client is reluctant to make significant distribu-

tions over and above the items mentioned in my prior letter.

In Schwartzel's letter transmitting the accounting, he stated to the Thompsons: "[A]s you know, this firm has for many years represented Dixie Pipe Sales Company and various members of the Beeley family." However, the Thompsons had actually *not* been aware of V & E's representation of Dixie and the Beeleys.

Upon receiving the accounting from Schwartzel, a meeting was held between the Thompsons' representatives, Johnson, and Schwartzel. After the meeting, the Thompsons' accountant inventoried the documents which supported Schwartzel's accounting. He found, apparently misfiled, Wharton's letter to Raymond and Margaret which discussed the plan "to make certain that the Dixie stock did not fall into the hands of [the Thompsons]."

The Thompsons subsequently demanded that ownership of the Dixie stock be transferred immediately to their names. Robert then notified them that their request triggered the "restrictions" set out in Dixie's bylaws, and that Dixie was exercising its "right" to purchase the stock at book value. The amount of "book value" was determined by Johnson. Ultimately, the Thompsons filed this lawsuit. **This concludes the recitation of the Thompsons' factual allegations against V & E in their first amended petition.**

The Thompsons' first amended petition is very specific and ordered in setting out their causes of action and the parties against whom the respective causes of action are being brought. They bring the following causes of action against V & E: (1) "professional negligence;" (2) violation of confidential relationship; (3) breach of fiduciary duty; (4) conversion; (5) violation of the Texas Deceptive Trade Practices Act (DTPA); (6) fraud; and (7) breach of contract. Throughout their brief, the Thompsons also refer to a claim of conspiracy they allegedly brought against V & E. Also in their brief, they mention V & E's "participation in ... interference in inheri-

tance rights." We address each claim separately, beginning with conspiracy.

Nowhere in their first amended petition did the Thompsons allege that V & E engaged in a conspiracy. Their causes of action are individually set out in highlighted headings, in a specific, orderly fashion. Under each heading is a list of the defendants against whom the Thompsons are bringing that particular cause of action. There is no mention of conspiracy, regarding V & E or any other defendant. Conspiracy simply was not pled. This claim was not before the trial court, and, as such, the Thompsons' claim of conspiracy cannot be considered by this Court. *See City of Houston v. Clear Creek Basin Authority,* 589 S.W.2d 671, 678 (Tex.1979).

Nor did the Thompsons plead "interference in inheritance rights." We cannot consider this claim, either. *See Clear Creek Basin Authority,* 589 S.W.2d at 678–79.

■■■ The Thompsons properly pled fraud and breach of contract. In regard to fraud, in its motion for summary judgment, V & E pled and supported two assertions with summary judgment proof: (1) V & E did not make any representation to the Thompsons, and (2) the Thompsons did not rely on any representation made by V & E.[1] In their response, the Thompsons did not present evidence that V & E made a representation or show that they relied on a representation made by V & E. Nor do they present this issue to us on appeal. The fraud claim is not before us. *See Clear Creek Basin Authority,* 589 S.W.2d at 678–79.

In regard to breach of contract, V & E stated in its motion for summary judgment and proved that it had no contract with the Thompsons. In their response, the Thompsons did not submit evidence of a contract. They do not present this issue on appeal, either. The breach of contract claim is not

before us. *See Clear Creek Basin Authority,* 589 S.W.2d at 678–79.

■■■ Regarding the Thompsons' claim for professional negligence, V & E argued in the trial court and argues here that the Thompsons do not have standing to assert such a claim against V & E because the Thompsons were not in privity with V & E. For the purposes of a claim for professional negligence, "privity" means the contractual connection or relationship that exists between the attorney and the client. *See Dickey v. Jansen,* 731 S.W.2d 581, 582 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.). "Texas law does not recognize a cause of action for negligence against an attorney asserted by one not in privity with that attorney[.]" *Id.* Texas cases "have consistently held that third parties have no standing to sue attorneys on causes of action arising out of their representation of others." *Id.* at 582–83.

In *Dickey,* testamentary trust beneficiaries brought a cause of action for professional negligence against the testator's attorney and law firm for negligent preparation of a trust provision. 731 S.W.2d at 582. The trust provision at issue was to have included mineral interests in Louisiana, but the provision was invalid under Louisiana law. *Id.*

The defendants moved for summary judgment, arguing that "an attorney is not liable to ... those not in privity to attorneys ... for alleged failure to perform duties which the attorney owes only to his clients." *Dickey,* 731 S.W.2d at 582. The trial court granted the defendants' motion. *Id.* This Court affirmed, rejecting the plaintiffs' argument that they were entitled to maintain their action as third party beneficiaries to the employment contract between the testaor and the attorney. *Id.*

Here, V & E showed by proper summary judgment proof that there was no privity between it and the Thompsons. V & E

---

1. That a material representation was made by the defendant is the first element of a cause of action for fraud. *Stone v. Lawyers Title Ins. Corp.,* 554 S.W.2d 183, 185 (Tex.1977). In regard to constructive fraud, this tort can only occur upon the breach of a duty. *Gillum v.*

*Republic Health Corp.,* 778 S.W.2d 558, 571 (Tex. App.—Dallas 1989, no writ). However, we hold that here, for reasons that will be clear later in the opinion, V & E had no duty to the Thompsons.

attached excerpts from both Edward H. Thompson's and Rebecca Thompson Perry's depositions to its motion for summary judgment. Regarding the privity issue, Edward H. Thompson testified as follows:

Q. Had you ever had any dealings with Vinson & Elkins?

A. No, sir.

. . . . .

Q. Other than hearing about Vinson & Elkins, you hadn't had any dealings with them?

A. Certainly not to my knowledge.

Q. All right. I take it you never hired Vinson & Elkins to represent you, did you?

A. That is correct.

. . . . .

Q. [Y]ou never hired Vinson & Elkins, did you?

A. I did not.

Q. Have you ever spoken to any lawyer who works for Vinson & Elkins, to your knowledge?

A. To my knowledge, no, not knowing that they were a lawyer with Vinson & Elkins.

Q. I understand. You might have spoken to somebody on the street that you didn't know was a Vinson & Elkins lawyer?

A. That's true.

Q. But you, to the best of your knowledge, in your lifetime you have never sat down and conversed with a lawyer from Vinson & Elkins, have you, sir?

A. No, sir.

Rebecca Thompson Perry testified as follows:

Q. I take it, then, to your knowledge, you never consulted with any Vinson & Elkins lawyer, did you?

A. No, I had not.

Q. Never shared any kind of confidence with Vinson & Elkins lawyers. True?

A. No.

Q. And you have never been given any advice by a lawyer from Vinson & Elkins, have you?

A. No.

Q. And you have never relied on any advice from any Vinson & Elkins lawyer, have you?

A. No.

In their brief, the Thompsons acknowledge a lack of privity between them and V & E.[2] However, they ask us to "relax" the privity requirement. We believed when writing *Dickey* that the requirement is well-reasoned and should not be "relaxed" in a case brought against an attorney by parties who are not the attorney's clients, but who are instead would-be "third party beneficiaries" of the attorney-client relationship. 731 S.W.2d at 583. We decline to depart from our reasoning or our holding.[3]

■ The Thompsons also ask that we apply section 552 of the Restatement (Second) of Torts, which states in relevant part that one who, in the course of his business, supplies false information to others, may be liable for the loss suffered by a person

---

**2.** "[I]t is undisputed that, at all relevant times, V & E provided legal services to Johnson, as trustee of the Trust, and V & E never provided legal services directly to either of the Appellants[.]"

**3.** The Thompsons contended in oral argument that the privity requirement has been nullified in cases such as this one, citing *American Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480 (Tex.1992). There, the Texas Supreme Court held "that an excess carrier may bring an equitable subrogation action against the primary carrier." *Id.* at 483. Under the theory of equitable subrogation, "the insurer paying a loss under a policy becomes equitably subrogated to any cause of action the insured may have against a third party responsible for the loss." *Id.* at 482. The excess insurer is "thus able to maintain any action that the insured may have against the primary carrier for mishandling of the claim." *Id.*

The court wrote that the same "considerations that have resulted in our recognizing an excess carrier's right to bring an equitable subrogation action against the primary insurer offer similar support for an action by the excess carrier against defense counsel." *Id.* at 484. While we recognize the grounds for a comparison on the issue of privity, we do not find *American Centennial* either on point or persuasively analogous. It does not address the issue presented here or otherwise aid in our determination of it. In our view, it clearly did not nullify the privity requirement in cases such as the one at bar.

for whose benefit he supplies the information. *See* Restatement (Second) of Torts § 552 (1977). However, Texas courts of appeals have rejected the idea of applying section 552 to lawyers. *See First Municipal Leasing Corp. v. Blankenship, Potts, Aikman, Hagin & Stewart,* 648 S.W.2d 410, 413–14 (Tex.App.—Dallas 1983, writ ref'd n.r.e.); *Bell v. Manning,* 613 S.W.2d 335, 338 (Tex.Civ.App.—Tyler 1981, writ ref'd n.r.e.).

We agree with the holdings in those cases. A nonclient should not have a negligence cause of action against an attorney under facts such as those presented here. The trial court was correct in granting summary judgment on the Thompsons' professional negligence claim against V & E.[4] We next consider whether summary judgment was proper on the Thompsons' claim of breach of fiduciary duty.

The term "fiduciary relationship" means "legal relations between parties created by law or by the nature of the contract between them where equity implies confidence and reliance." *Peckham v. Johnson,* 98 S.W.2d 408, 416 (Tex.Civ. App.—Fort Worth 1936), *aff'd sub nom.,* 132 Tex. 148, 120 S.W.2d 786 (1938). Fiduciary relationships are recognized in a variety of legal relations, historically including those involving attorney and client, *see Willis v. Maverick,* 760 S.W.2d 642, 645 (Tex.1988), and trustees, *see Hickman v. Stone,* 69 Tex. 255, 5 S.W. 833, 834–35 (1887).

Here, however, V & E, as discussed above, did not have an attorney-client relationship with the Thompsons. Nor was V & E the Thompsons' trustee. Rather, according to the Thompsons' pleadings, V & E represented Irma's "estate" and "trust."

There is considerable authority, however, that, as a matter of law, one cannot represent an "estate." An estate is not a legal entity that can sue or be sued. *Henson v. Estate of Crow,* 734 S.W.2d 648, 649 (Tex.1987); *Price v. Estate of Anderson,* 522 S.W.2d 690, 691 (Tex.1975) ("[T]he 'estate' of a decedent is not a legal entity and may not properly sue or be sued[.]").

Nor do we believe that V & E represented the "trust." A trust is not a legal entity. *See Rippstein v. Unthank,* 380 S.W.2d 155, 157 (Tex.Civ.App.—Amarillo 1964), *rev'd on other grounds,* 386 S.W.2d 134 (Tex.1964) (a trust is a "confidence reposed in one person"); *Coverdell v. Mid–South Farm Equip. Ass.,* 335 F.2d 9, 13, 14 (6th Cir.1964) (a trust cannot sue or be sued, but rather legal proceedings are properly directed at the trustee); Restatement (Second) of Trusts § 2 (1959) (a trust is a "relationship").

Even if V & E did represent Irma's estate or the trust, we would decline to hold under these facts that the concept of a fiduciary relationship stretches far enough to cover the relationship between a residual beneficiary of a trust and the attorney representing either (a) the estate of the decedent whose will created the trust, or (b) the trust itself.

> A fiduciary duty is an extraordinary one and will not be lightly created. The mere fact that one subjectively trusted the other does not, alone, indicate that he reposed confidence in the other in the sense demanded by fiduciary relations, because something apart from the transaction itself is necessary.

*Gillum v. Republic Health Corp.,* 778 S.W.2d 558, 567 (Tex.App.—Dallas 1989, no writ).

Furthermore, contrary to the Thompsons' pleadings, but as acknowledged in their brief, the record indicates that V & E's involvement with the trust itself was in

---

4. In so holding, we reject the Thompsons' argument that "[a]ll claims against V & E are assets of the Trust which have now vested in Appellants, and Appellants now have ownership of the claims and standing to assert them." A "trust," as we discuss later in this opinion, is not a legal entity. Title to the "assets" is actually held by the *trustee.* Restatement (Second) of Trusts § 2 (1959). The Thompsons cite no authority, and we can find none, for the proposition that a trustee's potential claim against his attorney, based on the advice rendered by the attorney to the trustee, could somehow vest in the beneficiaries. We believe such a holding would conflict with the privity rule.

representing one of the trustees, Johnson. Although a fiduciary relationship may exist between the beneficiary of a trust and a trustee, under the facts presented here, no fiduciary relationship exists between the beneficiary of a trust and *the attorney representing* a trustee. The trial court was correct in granting summary judgment on the Thompsons' breach of fiduciary claim against V & E.[5]

It was also correct in granting summary judgment on the Thompsons' claim against V & E for violation of a confidential relationship. A confidential relationship exists when "one party is in fact accustomed to being guided by the judgment or advice of the other, or is justified in placing confidence in the belief that such party would act in its interest." *Thames v. Johnson*, 614 S.W.2d 612, 614 (Tex.Civ. App.—Texarkana 1981, no writ).

Edward H. Thompson testified that he never "had any dealings" with V & E, had never hired it, and had never, to his knowledge, even spoken to one of its lawyers. He therefore was clearly not "accustomed to being guided by the judgment or advice" of V & E. Nor would he have been "justified in placing confidence in the belief" that V & E would act in his interest, considering that he had never had any dealings with V & E and that he was not V & E's fiduciary.

Rebecca Thompson Perry testified that she had never consulted, shared a confidence with, or been given advice by V & E.

Nor was she V & E's fiduciary. We reach the same conclusion regarding Rebecca Thompson Perry as we reached with Edward H. Thompson. Neither had a confidential relationship with V & E.

We now turn to the Thompsons' claim against V & E for conversion. "Conversion" is "the wrongful exercise of dominion and control over another's property in denial of or inconsistent with his rights." *Earthman's, Inc. v. Earthman*, 526 S.W.2d 192, 198–99 (Tex.Civ.App.— Houston [1st Dist.] 1975, no writ).

The summary judgment evidence demonstrates that V & E never "wrongful[ly] exercise[d] dominion or control" over the shares of Dixie stock from Irma's estate. However, in their brief, the Thompsons argue:

> V & E wrongly advised DPS [Dixie] and Robert Beeley that the Appellants' Stock was subject to redemption. Based upon that advice, *DPS* converted Appellants' Stock.

(Emphasis added.)

The Thompsons, however, cannot reach V & E with a conversion claim based upon such a complaint. They have no conversion claim against a lawyer who allegedly "wrongly advised" another party, thus leading to the *other party's* alleged conversion of their property. Any claim here for the allegedly wrong advice supplied by the attorney rests with the wrongly advised party itself.[6] The trial court was correct in

---

**5.** Citing *Kinzbach Tool Co. v. Corbett–Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509 (1942), and *Kirby v. Cruce*, 688 S.W.2d 161 (Tex.App.—Dallas 1985, writ ref'd n.r.e.), the Thompsons also argue that they have a claim against V & E for V & E's "knowing participation" in Johnson's breach of his fiduciary duty to the Thompsons. We agree with the Thompsons that when a third party knowingly participates in a fiduciary's breach of his fiduciary duty, the third party becomes a joint tortfeasor with the fiduciary and may be held liable as such. *See Kinzbach*, 160 S.W.2d at 514. However, neither *Kinzbach* nor *Kirby* involved a beneficiary bringing a breach of fiduciary duty claim against the fiduciary's attorney. We believe that allowing the Thompsons to bring such a claim against V & E would, under the facts of this case, conflict with the privity rule.

The Thompsons also refer us to *Likover v. Sunflower Terrace II, Ltd.*, 696 S.W.2d 468 (Tex. App.—Houston [1st Dist.], no writ). There, we noted that "an attorney is liable if he knowingly commits a fraudulent act that injures a third person, or if he knowingly enters into a conspiracy to defraud a third person." *Id.* at 472. That rule, however, does not apply here. As will be clear later in the opinion, the summary judgment evidence showed that the Thompsons were not injured by V & E's alleged acts. And, as previously noted, the Thompsons did not plead that V & E engaged in a conspiracy.

**6.** Furthermore, V & E's advice turned out not to be wrong. The by-law provision upon which V & E based its advice that the Thompsons' stock was subject to redemption was recently held to be valid by the Fourteenth Court of Appeals in *Dixie Pipe Sales, Inc. v. Perry*, 834 S.W.2d 491

granting summary judgment on the Thompsons' conversion claim against V & E.

Regarding the Thompsons' claim against V & E for violating the DTPA,[7] we note that, to recover under the DTPA, the plaintiff must be a consumer. *MacDonald v. Texaco, Inc.*, 713 S.W.2d 203, 205 (Tex.App.—Corpus Christi 1986, no writ).

A DTPA "consumer" is "an individual ... who seeks or acquires by purchase or lease, any goods or services ..." TEX.BUS. & COM.CODE ANN. § 17.45(4) (Vernon 1987). The "goods or services" sought or acquired by the plaintiff must form the basis of its DTPA complaint. *Commercial Escrow Co. v. Rockport Rebel, Inc.*, 778 S.W.2d 532, 536 (Tex.App.—Corpus Christi 1989, writ denied).

Here, as demonstrated by the deposition testimony of the Thompsons set out above, the Thompsons did not directly "seek or acquire" any "goods or services" from V & E. We recognize, however, that:

> Privity between the plaintiff and defendant is not a consideration in deciding the plaintiff's status as a consumer under the DTPA ... A plaintiff establishes his standing as a consumer in terms of his relationship to a transaction, not by a contractual relationship with the defendant.

*Kennedy v. Sale*, 689 S.W.2d 890, 892–93 (Tex.1985) (quoting *Flenniken v. Longview Bank & Trust*, 661 S.W.2d 705, 707 (Tex. 1983)); *see also Wellborn v. Sears, Roebuck & Co.*, 970 F.2d 1420, 1426 (5th Cir. 1992).

V & E asserts that none of the cases in the *Kennedy* line, decided before or after, "have involved a third party suit against an attorney solely alleging the attorney's negligence." We note, however, that: (1) *this* lawsuit did not "solely allege[ ] the attorney's negligence," because the Thompsons pled other, non-negligence

causes of action besides professional negligence; and (2) because attorneys may be subject to liability under the DTPA, *see DeBakey v. Staggs*, 605 S.W.2d 631, 633 (Tex.Civ.App.—Houston [1st Dist.] 1980, *writ ref'd n.r.e.*, 612 S.W.2d 924 (Tex.1981), and because privity between plaintiff and defendant is not required in a DTPA action, *see Kennedy*, 689 S.W.2d at 892–93, we believe that no privity is required in a DTPA case against an attorney, as well.

Nevertheless, the trial court was correct in granting summary judgment on the Thompsons' claim against V & E for violating the DTPA. The summary judgment evidence demonstrated that the alleged DTPA violations that the Thompsons assert V & E committed were not a producing cause of any damages. For example, in her deposition, Rebecca Thompson Perry testified as follows:

> Q. In that letter from Mr. Wharton there was discussion of the possibility of the company buying not only the Irma Beeley estate stock but simultaneously Raymond [sic] stock, correct?
>
> A. Yes, and that was on June 27th of '86.
>
> Q. Right. And you know that that did not happen did it?
>
> A. Yes.
>
> Q. Yes, you know that it did not happen?
>
> A. Yes, I do know that it did not happen.
>
> Q. You say in your petition that that plan was shelved, correct?
>
> A. That's correct.
>
> .    .    .    .    .
>
> Q. You never consented to take book value for the stock, did you?
>
> A. No, I did not.
>
> Q. Whatever Vinson & Elkins ... attempted to maneuver you into doing, you didn't do it, did you?

*DeBakey v. Staggs*, 605 S.W.2d 631, 633 (Tex.Civ. App.—Houston [1st Dist.] 1980), *writ ref'd n.r.e.*, 612 S.W.2d 924 (Tex.1981).

---

(Tex.App.—Houston [14th Dist.], 1992, writ denied).

**7.** We agree with the Thompsons that attorneys may be subject to liability under the DTPA. *See*

A. No, I did not.

.   .   .   .   .

Q. So whatever ... Vinson & Elkins [was] trying to maneuver you into doing, you just didn't do it, did you?

A. No, I don't believe I did.

In his deposition, Edward H. Thompson testified as follows:

Q. [I]f Mr. Schwartzel was trying to threaten you or coerce you into waiving some right you had with respect to stock, it didn't work, did it, sir?

A. I don't believe it did, sir.

.   .   .   .   .

Q. The letter indicated the possibility was for ... the estate to sell the shares and your Uncle Ray Beeley sell his shares back at the same time, correct?

A. I think that was suggested.

Q. And you know that never happened, don't you, sir?

A. I don't believe it happened.

.   .   .   .   .

Q. Prior to receiving notification from Dixie Pipe Sales regarding the calculation of book value, nobody had represented to you what the value of that Dixie Pipe stock was other than perhaps your own lawyers, true, sir?

A. No one has represented that to me, no, sir.

That the alleged false, misleading, or deceptive act or practice be a producing cause of damages to the plaintiff is an element of a DTPA claim. TEX.BUS. & COM.CODE ANN. § 17.50(a) (Vernon 1987); *MacDonald,* 713 S.W.2d at 205. The summary judgment evidence disproved this element. As such, V & E was entitled to summary judgment on this claim. *See Rosas v. Buddies Food Store,* 518 S.W.2d 534, 537 (Tex.1975); *Southwest Indus. Import & Export, Inc. v. Borneo Sumatra Trading Co.,* 666 S.W.2d 625, 627 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.).

The Thompsons lastly contend that "outstanding discovery issues preclude the granting of V & E's summary judgment." [8] They argue:

[O]utstanding discovery issues remain pending in the court below and are the subject of numerous motions to compel filed by Appellants. These motions are directed to Defendants V & E, DPS [Dixie], and Robert Beeley. The documents requested by Appellants relate to V & E's representation of the Trust, of Johnson, as trustee, of DPS, and of Robert Beeley. In response to the request for production, depositions, and motions to compel compliance with such request, V & E and Johnson have generated a document entitled "Privileged Documents List" ... [T]he trial court [has] fail[ed] to address these motions[.]

The record shows that the Thompsons sued V & E on March 7, 1991. It shows that V & E moved for summary judgment on March 30, 1992. The trial court granted summary judgment to V & E on June 8, 1992. Therefore, the Thompsons had over a year to conduct discovery before V & E moved for summary judgment, and over 15 months before summary judgment was entered.

The Thompsons' motions to compel were filed on August 12 and September 23, 1991. The latest of these dates was over six months before V & E moved for summary judgment, and over eight months before summary judgment was entered.

Furthermore, the record does not reflect that the Thompsons' motions to compel were ever presented to the trial court for a ruling. The record does not contain a request for an oral hearing on either motion or a submission date for either motion.

Under these circumstances, we hold that the trial court did not err in granting a properly filed, valid motion for summary judgment despite the "outstanding discovery issues."

---

**8.** V & E was entitled to *move* for summary judgment at any time. A "party against whom a claim ... is asserted ... may, *at any time,* move with or without supporting affidavits for a sum-mary judgment in his favor as to all or any parts thereof." TEX.R.CIV.P. 166a(b) (emphasis added).

We overrule the Thompsons' point of error and affirm the judgment of the trial court.